**ENBRIDGE PIPELINES (EAST TEXAS) L.P., Petitioner,**

v.

**AVINGER TIMBER, LLC, Respondent.**

No. 10–0950.

Supreme Court of Texas.

Argued Feb. 27, 2012.

Decided Aug. 31, 2012.

Rehearing Denied Dec. 14, 2012.

Eric Wayne Doerries, Enbridge Energy Company, Inc., Lauren Elizabeth Tanner, Stephen G. Tipps, Baker & Botts, L.L.P., Houston, TX, Thomas E. Sheffield, Attorney at Law, Kemah, TX, Thomas H. Buchanan, Flowers Davis PLLC, Tyler, TX, Thomas R. Phillips, Baker Botts L.L.P., Austin, TX, for Enbridge Pipeline (East Texas) L.P.

Charles R. 'Skip' Watson Jr., Locke Lord Bissell & Liddell, L.L.P., Christopher S. Johns, Dawson & Sodd LLP, Mike A. Hatchell, Locke Lord LLP, Austin, TX, Clay Beard, Glenn Sodd, Jody Sodd McSpadden, William Jason Sodd, Dawson, Sodd, Ellis & Hodge, LLP, Corsicana, TX, John R. Mercy, Mercy Carter Tidwell

LLP, Texarkana, TX, for Avinger Timber LLC.

Thomas J. Forestier, Winstead PC, Houston, TX, for Amicus Curiae Centerpoint Energy Gas Transmission Company, LLC.

Lewis L. Isaacks, Gay McCall Isaacks Gordon & Roberts, P.C., Plano, TX, for Amicus Curiae Crosstex Energy Services, L.P.

James E. Mann, Patrick Joseph Pearsall, Duggins Wren Mann & Romero LLP, Austin, TX, for Amicus Curiae El Paso Electric Company.

Thomas A. Zabel, Zabel Freeman Houston Attorneys, Houston, TX, for Amicus Curiae Enterprise Products Partners, L.P.

Alan B. Daughtry, Attorney-at-Law, Houston, TX, for Amicus Curiae Gas Processors Association.

Kurt Howard Kuhn, Kurt Kuhn, PLLC, Austin, TX, for Amicus Curiae Interstate Natural Gas Association of America.

Chance Dean Weldon, Pacific Legal Foundation, Sacramento, CA, for Amicus Curiae Pacific Legal Foundation.

Douglas G. Caroom, Emily Willms Rogers, Bickerstaff Heath Delgado Acosta LLP, Austin, TX, for Amicus Curiae Texas Farm Bureau.

William Gerow Christian, Graves Dougherty Hearon & Moody, PC, Austin, TX, for Amicus Curiae Texas Land and Mineral Owners Assoc'n.

Jeff Avant, Avant & Mitchell, L.P., Austin, TX, for Amicus Curiae Texas Oil & Gas Assoc'n.

Charles B. McFarland, Joyce McFarland & McFarland LLP, Houston, TX, for Amicus Curiae Texas Pipeline Association and Texas Municipal League.

Jeffery Frank Nadalo, Transcanada Keystone Pipeline, L.P., Stephen K. Carroll, Fulbright & Jaworski L.L.P., Houston, TX, for Amicus Curiae Transcanada Keystone Pipeline, L.P.

Justice LEHRMANN delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice HECHT, Justice WAINWRIGHT, Justice MEDINA, and Justice GUZMAN joined.

This case involves a dispute over the fair market value of acreage on which a gas processing facility is located. We must decide whether the trial court abused its discretion by admitting an expert's testimony that allegedly violated the value-to-the-taker rule, which prohibits measuring land's value by its unique value to a condemnor in determining a landowner's compensation. We hold that the expert's testimony violated the rule because it impermissibly focused on the condemnor's interest in retaining the property and was therefore inadmissible. Because the court of appeals erred when it concluded that the trial court did not abuse its discretion, we reverse and remand to the trial court.

Almost forty years ago, the predecessors in interest of Avinger Timber, LLC leased twenty-four acres to a gas processing company so the company could build and operate a gas processing facility. The lease gave the gas processing company an endless right of renewal. The land was in one of the state's most productive counties for natural gas and already had many pipelines running underneath it. A large gas processing facility was built, and easements were freely granted by Avinger for additional pipelines, roads, and a high-voltage electric line. In 1998, the lease was renewed, but without the endless right of renewal, giving Avinger a reversionary interest in the land. Enbridge Processing, LP ("Enbridge Processing") took over as the lessee. When the expiration date for

the lease was looming and the parties were unable to agree on a rental price for renewal, Enbridge Processing merged with a public utility, Enbridge Pipelines (East Texas) L.P. ("Enbridge Pipelines"), and filed a condemnation petition to condemn the land. The commissioners awarded Avinger $47,580, but Avinger objected to the commissioners' default award and went to trial on the issue of fair market value of the condemned acreage. Challenges were made to each party's expert. The trial court allowed Avinger's expert's testimony but excluded the testimony of Enbridge Pipelines's expert. The jury awarded Avinger $20,955,000 as just compensation for the tract, and the trial court rendered judgment on that verdict. The court of appeals affirmed, holding that Avinger's expert's testimony did not violate the value-to-the-taker rule, which prohibits measuring a land's unique value to a condemnor, and the project-enhancement rule, which prohibits consideration of any enhancement to the value of the property that results from the taking itself. The court of appeals held that the jury was entitled to consider the value of improvements constructed by prior lessees and the cost savings to a potential purchaser.

We must decide whether Avinger's expert's testimony should have been excluded. Because we hold that the trial court abused its discretion by admitting testimony that violated the value-to-the-taker rule by impermissibly focusing on Enbridge Pipelines' cost savings, we reverse and remand to the trial court.

## I. Factual and Procedural History

In 1973, the Simpson family, which owns Avinger, leased a 23.79–acre portion of their 418 acres to a gas processing company, Tonkawa Gas Processing Company, so that Tonkawa could build and operate gas processing facilities. Tonkawa was a private company that lacked condemnation power. At the time of the lease, the land already had several pipelines running underneath it. The 1973 lease was a ten-year lease that gave the lessee the perpetual option to renew for an additional ten years, giving the lessee an endless right of renewal. Annual rent was $500. Both parties had the right to arbitrate if no agreement was reached on new rents. The lessee was "the sole owner" of "all gas processing facilities and other improvements" on the property. If the lease expired, the lessee could remove its plant "within a reasonable time not to exceed six (6) months" or the landowner could "negotiate with [the lessee] for purchase" of the gas processing facility.

Tonkawa built a large natural gas processing facility on the land, and the Simpsons freely granted easements for roads, additional pipelines, and a high-voltage electric line. At least fifteen separate natural gas pipelines connected to the plant and the site became known as a gas processing hub in one of Texas's most productive counties. The lease was renewed in 1984 for fifteen years on the same terms, except that the annual rent was increased to $4,000. Tonkawa then sold the plant to Koch Midstream Processing Company, which took over the lease interest, and Avinger became the successor lessor.

In 1998, Avinger renewed the lease with Koch, but on different terms. The lease term was reduced to three years with a three-year option. Annual rent was increased to over $21,000. Importantly, the language giving the gas processing company a right of never-ending lease renewals was removed, giving Avinger a reversionary interest in the land. Koch renewed the lease at the end of the three-year term, and Enbridge Processing became the gas plant operator and successor les-

see after purchasing the lease and the plant from Koch. Like Tonkawa and Koch, Enbridge Processing was a private company that lacked the power of eminent domain.

With the lease expiration date nearing and the parties unable to agree on a rental price for a lease renewal, Enbridge Pipelines,[1] a public utility company, sent an offer to Avinger to purchase the land for $35,685. At the time Enbridge Pipelines sent the offer, it was not the owner of the gas processing facility or the lessee of the property. Avinger refused the offer. Enbridge Processing then merged with Enbridge Pipelines and secured the right to acquire the property through eminent domain. A petition for condemnation was filed, and the commissioners awarded Avinger $47,580 as compensation after it failed to appear at the valuation hearing. Avinger objected to the commissioners' default award and went to trial on the issue of fair market value.

At trial, Enbridge Pipelines's expert, Albert Allen, valued the property at $47,940, with the land's highest and best use as vacant rural residential property using sales comparison analyses. Avinger's expert, David Bolton, valued the property at $20,955,000, with its highest and best use as industrial property to house a gas processing plant. Bolton used a comparable sales methodology, two income approaches, and additional intrinsic value analyses in reaching his conclusion. In reaching the value of the property, Bolton relied on the provision in the lease which required the lessee to remove all improvements on the

land within six months of the lease's termination. He testified that the value of the property to Enbridge would have been much greater than the $20,955,000 amount he concluded was its market value because the terms of the lease required Enbridge to remove its plant within six months, an obligation that Enbridge avoided by condemning the property. To determine the value added to Avinger's interest by Enbridge Pipelines's obligation to remove the gas plant, Bolton consulted with Donald Niemiec, a gas-industry expert. Bolton's report stated that (1) the lease agreement was in effect at the time of the condemnation; (2) the lease agreement forms part of the fair market value of the land burdened by the lease; (3) the lease required the lessee to remove its improvements, including the gas processing facility; (4) Enbridge Pipelines, the condemnor, would not be removing the facility under the terms of the lease; and (5) Enbridge Pipelines's cost savings is incorporated into the value of the land.[2] Based on Niemiec's testimony about practices in the gas processing industry, Bolton's expert report concluded that a prudent and knowledgeable investor, considering Enbridge Pipelines's cost savings, would pay between $21,750,000 and $28,500,000 for Avinger's interest.

In calculating the comparable sales analyses, Bolton started with six similar industrial property sales with an average value of $13,480 an acre. Bolton then added value for the pipeline infrastructure and the lessee's cost of complying with the lease by removing the improvements on

1. Enbridge Pipelines was a corporate affiliate of Enbridge Processing.

2. Bolton's report was not submitted to the jury, except for a single page. It was admitted, however, in a pre-trial hearing for the judge's consideration in determining admissibility. Although neither the report nor the

testimony should have been admitted as proof of valuation, the dissent's focus on the report's not having been presented to the jury is misplaced. We discuss the report in assessing whether Bolton's opinion and its underlying methodology violated the value-to-the-taker rule.

the land, reaching a value of $22,000,000, or $924,758 per acre. Bolton also valued the land using the discounted cash flow method and the direct capitalization method. Under the discounted cash flow method, Bolton reached a value of $18,904,350. To reach this amount, Bolton speculated that Avinger and Enbridge Pipelines would renew the lease for three additional years and that Enbridge Pipelines would pay $63,158 in rent over the three year term. Bolton calculated Avinger's reversionary interest in the fourth year as being worth $22,000,000, the value reached for his comparable sales analyses. Under the direct capitalization method, Bolton relied on the cost savings to Enbridge Pipelines in avoiding business disruption and reached a value of $22,275,000. Although Bolton's expert report concluded that a prudent and knowledgeable investor, considering Enbridge Pipelines's cost savings, would pay between $21,750,000 and $28,500,000 for Avinger's interest, at trial, he testified that the land was still worth $20,955,000 even if Enbridge Pipelines did not exist and the plant was "swept away by a tornado."

Both Avinger and Enbridge Pipelines moved to exclude the other party's expert's testimony. Enbridge Pipelines argued that Bolton's testimony impermissibly relied on project-enhancement by considering the enhancements in the property's value resulting from the taking and value-to-the-taker by considering the land's unique value to Enbridge Pipelines. Avinger contended that Allen's testimony was flawed because it did not appraise the land as it existed on the date of the taking—he falsely assumed the property was vacant and barren. The trial court denied Enbridge Pipelines's motion to exclude Bolton's testimony, and granted Avinger's motion to exclude Allen's testimony. The jury awarded Avinger $20,955,000 as compen-sation, and the trial court rendered judgment on the verdict.

The court of appeals affirmed the trial court's judgment. 326 S.W.3d 390, 396. The court of appeals held that the jury was entitled to consider the improvements constructed by prior lessees and the cost savings to a potential purchaser to avoid removing and either relocating or replacing the plant. *Id.* at 405–06. The court of appeals held that Bolton's testimony did not violate the value-to-the-taker rule, since the value of the tract as a gas processing facility was not unique to Enbridge Pipelines. *Id.* at 406–08. Additionally, the court of appeals held that the testimony did not violate the project-enhancement rule, since the land's value was not a result of the taking itself and the plant had enhanced the value of the land long before Enbridge Pipelines manifested an intent to condemn the tract. *Id.* at 408. The court of appeals also affirmed the trial court's exclusion of Enbridge Pipelines's expert's testimony, stating that "[t]he trial court was within its discretion to conclude Allen's opinion was unreliable." *Id.* at 413.

## II. Valuation in a Condemnation Proceeding

"Compensation for land taken by eminent domain is measured by the fair-market value of the land at the time of the taking." *Exxon Pipeline Co. v. Zwahr,* 88 S.W.3d 623, 627 (Tex.2002); *see City of Harlingen v. Estate of Sharboneau,* 48 S.W.3d 177, 183 (Tex.2001). The objective of the condemnation process is to make the landowner whole. *See* TEX. CONST. art. I, § 17 (guaranteeing "adequate compensation"). The factfinder may consider the highest and best use of the condemned land. *Zwahr,* 88 S.W.3d at 628. There is a presumption that the highest and best use of the land is the existing use of the land. *Id.; see also United States v. 8.41 Acres of Land,* 680 F.2d 388, 394–95 (5th Cir.1982).

Enbridge Pipelines contends that the trial court erred in admitting Bolton's testimony, as it violated both the value-to-the-taker rule and the project-enhancement rule. Enbridge Pipelines also challenges the exclusion of Allen's testimony. Avinger responds that Bolton's testimony properly valued the land's fair market value and did not violate either the value-to-the-taker or the project-enhancement rule. Avinger also argues that Allen's testimony was properly excluded.

The trial court must act as an evidentiary gatekeeper to exclude irrelevant and unreliable expert evidence. *Zwahr*, 88 S.W.3d at 629. It has broad discretion with respect to this function. *Id.* In determining whether an abuse of discretion occurred in the inclusion of Bolton's testimony and the exclusion of Allen's, we look to see whether the trial court acted without reference to guiding principles or rules. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985).

An expert's testimony must be relevant to the issues and based upon a reliable foundation. Tex.R. Evid. 702; *Zwahr*, 88 S.W.3d at 628. Expert testimony is unreliable if "there is too great an analytical gap between the data the expert relies upon and the opinion offered." *Zwahr*, 88 S.W.3d at 629; *accord Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 727 (Tex.1998). If an appraiser utilizes improper methodology or misapplies established rules and principles, the resulting testimony is unreliable and must be excluded. *Zwahr*, 88 S.W.3d at 631.

### A. Bolton's testimony violated the value-to-the-taker rule and was therefore inadmissible.

Enbridge Pipelines contends that Bolton's testimony violated both the value-to-

the-taker rule and the project-enhancement rule. Avinger responds that Bolton's testimony properly reflected the fair market value of the tract and did not violate either the value-to-the-taker nor the project-enhancement rule. We hold that Bolton's testimony violated the value-to-the-taker rule by improperly focusing on the costs Enbridge Pipelines saved by avoiding its obligation to remove the plant under the lease agreement and remand to the trial court. Since a violation of either the value-to-the-taker rule or the project-enhancement rule would require us to remand the case to the trial court, we need not reach the issue of whether the testimony also violated the project-enhancement rule.

"[T]he objective of the judicial process in the condemnation context is to make the landowner whole." *Zwahr*, 88 S.W.3d at 628. In measuring the landowner's compensation for condemned property, "the question is, what has the owner lost, not what has the taker gained." *Boston Chamber of Commerce v. City of Boston*, 217 U.S. 189, 195, 30 S.Ct. 459, 54 L.Ed. 725 (1910); *accord United States ex rel. TVA v. Powelson*, 319 U.S. 266, 281, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943) ("[I]t is the owner's loss, not the taker's gain, which is the measure of compensation for the property taken.") The value-to-the-taker rule prohibits an owner from receiving an award based on a tract's special value to the taker, as distinguished from its value to others who may or may not possess the power to condemn. *See City of Dallas v. Rash*, 375 S.W.2d 502, 505 (Tex.Civ.App.-Dallas 1964, writ ref'd n.r.e.) (citing *United States v. Miller*, 317 U.S. 369, 375, 63 S.Ct. 276, 87 L.Ed. 336 (1943)).

Avinger owned 23.79 acres of land that had been the site of a gas processing facili-

ty for thirty-one years. The lease stated that the lessee owned its improvements, including the gas processing facility. The lease required Enbridge Pipelines to remove the plant from the land and restore Avinger's land to its original condition. The only interest that should have been appraised was Avinger's interest in the land. However, as we explain, this was not the interest that was valued in Bolton's report.

Avinger was entitled to have its land valued using its highest and best use. *See Zwahr,* 88 S.W.3d at 628. It is presumed that the land's highest and best use is that of its existing use, which in this case was the site of a gas processing facility. *See id.* Indeed, it appears that the land was uniquely situated to be the site of a gas processing facility. The land had a thirty-one year history as a gas processing site with all the required permits, had over fifteen separate natural gas pipelines running underneath it, each with its own easement, was connected to a high-voltage electricity line, and was located in one of Texas's most productive counties. The value of the land as a gas processing site is not exclusive to Enbridge Pipelines. Although Avinger was entitled to compensation for the distinct suitability of its land for a gas processing site, it was not entitled to be compensated for the land's unique value to Enbridge Pipelines as a result of the lease's terms.

■ Although Bolton testified that the land was worth $20,955,000 even if Enbridge Pipelines did not exist and the plant was "swept away by a tornado," other portions of Bolton's testimony flatly contradict those statements. Bolton's assessment was premised on the provision in the lease which required the lessee to remove all improvements on the land within six months of the lease's termination. Bolton's analysis explicitly took Enbridge Pipelines's cost savings into account. Bolton testified that his analysis took the existence of the plant into consideration, but he also testified that the land would have the same value if the plant did not exist. It is apparent that Bolton was not valuing the 23.79 acres improved by the pipeline infrastructure that Avinger lost, but rather the gas processing facility that Enbridge Pipelines gained. His analysis took into account the costs of building a new plant and Enbridge Pipelines's moving costs. In discussing the various appraisal techniques used and explaining that the cost approach was not applicable in this case, Avinger's expert testified that the "cost to relocate or disassemble and move the plant *is a cost that we have to analyze* because it's a factor of the lease." (Emphasis added). Even the testimony pointed out by the dissent acknowledges that Avinger's expert considered what "would have to be done to move this plant per the lease." These moving costs were amounts that Enbridge Pipelines saved by condemning the property; they did not enhance the value of the land that Avinger lost. Enbridge Pipelines is not required to pay more because it avoided the cost of removing the plant. Bolton's testimony "runs counter to the uniformly announced rule . . . that the condemnee is compensated for his loss . . . and not for any special advantage or benefit which may come to the condemnor." *See United States v. Hayman,* 115 F.2d 599, 601 (7th Cir.1940). We do not suggest that Avinger's experts should not have considered the effect, if any, that the lease (which expired before the taking occurred) had on the value of the property as required by the Uniform Standards of Professional Appraisal Practice (USPAP). Certainly, it was proper for any amount that the lease added to the value of the property taken to be considered. However, it was not proper for the experts to consider the cost of removing

the plant, as Enbridge was required to do within six months of the expiration of the lease, because of the special value this aspect of the lease provided to Enbridge. Therefore, we hold that Bolton's testimony violated the value-to-the-taker rule because it impermissibly focused on the benefit to Enbridge Pipelines in avoiding the cost of removing the plant. The trial court abused its discretion by admitting the portion of Bolton's testimony that was premised on Enbridge Pipelines's removal obligation under the lease agreement.

## B. The trial court did not abuse its discretion by excluding Allen's testimony.

■ Enbridge Pipelines also asserts that the trial court committed an abuse of discretion by excluding Allen's testimony. Avinger responds that Allen's testimony was properly excluded because it valued the land as vacant and unimproved rural residential property. We agree that the trial court did not abuse its discretion in excluding Allen's testimony.

■ This Court "must uphold the trial court's [decision to exclude evidence] if there is any legitimate basis for the ruling." Owens–Corning Fiberglas Corp. v. Malone, 972 S.W.2d 35, 43 (Tex.1998) (citing State Bar of Tex. v. Evans, 774 S.W.2d 656, 658 n. 5 (Tex.1989)). Allen valued the property with its highest and best use as vacant rural residential property. The presumed highest and best use of land is that of its existing use, which in this case was a gas processing facility. See Zwahr, 88 S.W.3d at 628. "[T]he landowner can rebut this presumption by showing a reasonable probability that when the taking occurred, the property was adaptable and needed or would likely be needed in the near future for another use." Id. However, the property had a thirty-one year history as a natural gas

facility and there is no evidence indicating that the property was adaptable and needed as residential property in the foreseeable future. Allen did not show why the existing use of the property was not the highest and best use.

■ "Unless an appraisal gives a value based on the land's condition at the time of condemnation—taking into account all relevant factors that affect its valuation, including the market for its possible future use—it is not relevant to the issue of market value." Sharboneau, 48 S.W.3d at 185. Not only did Allen's testimony fail to explain why the existing use of the property was not the highest and best use, his opinion did not offer fair market value of the land based on its condition at the time of condemnation and did not account for all relevant factors affecting valuation. His opinion did not account for the land's thirty-one year history as a gas processing site with all the required permits, the fifteen separate natural gas pipelines running underneath the land, each with its own easement, the site's connection to a high-voltage electricity line, and the land's location in one of Texas's most productive counties. Therefore, the court of appeals did not err in holding that the trial court did not abuse its discretion by excluding Allen's testimony.

## III. Conclusion

We hold that the trial court did not abuse its discretion by refusing to admit Allen's testimony but did abuse its discretion by admitting the portion of Bolton's testimony premised on Enbridge Pipelines's obligation to remove the plant under the lease agreement, which violated the value-to-the-taker rule by impermissibly valuing the costs Enbridge Pipelines saved by condemning the land and avoiding the removal obligation of the lease. Because Bolton's testimony was inadmissi-

ble, we reverse and remand to the trial court.

Justice JOHNSON filed a dissenting opinion, in which Justice GREEN and Justice WILLETT joined.

Justice JOHNSON, joined by Justice GREEN and Justice WILLETT, dissenting.

The Court, focusing on a report by Avinger's appraisal expert David Bolton that was not introduced into evidence at trial, concludes "[i]t is apparent that Bolton was not valuing the 23.79 acres improved by the pipeline infrastructure that Avinger lost, but rather the gas processing facility that Enbridge Pipelines gained," and his testimony "impermissibly focused on the benefit to Enbridge Pipelines in avoiding the cost of removing the plant." 386 S.W.3d at 263. I disagree that Bolton's testimony supports the Court's statement. I also disagree that the trial court abused its discretion by admitting the portion of Bolton's testimony related to Enbridge's contractual obligation to remove its plant. Bolton testified that the Uniform Standards of Professional Appraisal Practice (USPAP) and Texas law required him to consider the effect of the lease provision requiring Enbridge to remove its plant within six months after the lease expired, and he did. However, in his trial testimony, which is the issue here, he did not assign any value to that obligation. Rather, he valued only Avinger's land without Enbridge's plant on it, and clearly based his opinion of market value on accepted income and comparable sales methodologies. I respectfully dissent.

## I. Background

Beginning in 1973, predecessors in interest of Enbridge Pipelines (East Texas) L.P. (Enbridge) leased 23.79 acres of East Texas land (the property or the leased property) from the predecessors in interest of Avinger Timber, LLC (Avinger). In 2001 Enbridge Processing, an affiliate of Enbridge, acquired the lessee's interest in the Avinger lease, which had been renewed in 1998 and expired on April 2, 2004. During the 31 years the lease was in effect, a "mid-stream" gas processing plant was built on the property and environmentally permitted for processing operations, and infrastructure supporting operation of the plant was put in place. There is no dispute that (1) the Avinger lease expired on April 2, 2004; (2) the date of taking was April 7, 2004; (3) millions of cubic feet of raw natural gas flowed through fifteen or sixteen pipelines into Enbridge's plant for processing on a daily basis; (4) high voltage electrical lines had been built through surrounding raw timberland to supply electricity to the plant; (5) environmental permits were in place for operation of the gas processing plant; (6) the property is in one of the most prolific gas-producing counties in Texas and the field was predicted to produce until at least "the end of the century;" and (7) Enbridge was contractually required to remove its plant no later than six months from the date the lease term expired.

## II. Standards

A landowner whose property is taken by condemnation is entitled to compensation in the amount of its market value, which is the value to a willing buyer under no compunction to buy and to a willing seller under no compunction to sell. *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex.2001).[1] But the

---

1. The jury charge defined market value as follows:

The term "MARKET VALUE" means the price which the property would bring when

amount of compensation is determined by what is taken from the landowner, not what the property's special value might be to the taker. *See City of Dallas v. Rash*, 375 S.W.2d 502, 505 (Tex.Civ.App.—Dallas 1964, writ ref'd n.r.e.) (citing *United States v. Miller*, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943)). Bolton testified, and the parties do not dispute, that appraisers must consider every factor affecting a property's value when they appraise condemned property to determine its market value. That stands to reason because fact finders are to consider all factors that affect the property's value to willing buyers and sellers when they determine the market value of property taken through condemnation proceedings. *City of Ft. Worth v. Corbin*, 504 S.W.2d 828, 830 (Tex. 1974). Furthermore, Bolton testified that the USPAP requires appraisers to consider the effect on a property's value of lease or contractual agreements to which the property is subject and that Texas law requires appraisers to abide by those standards in making appraisals. *See* Tex. Occ. Code §§ 1103.002, .005, .154, .201, .405.

### III. The Testimony

### A. Donald Niemiec

Donald Niemiec was one of Avinger's witnesses. Before he retired, Niemiec worked in the mid-stream gas processing business for many years in several capacities for several companies, including managing multiple gas processing plants. He had been involved in valuing and selling mid-stream processing plants and was familiar with the factors affecting the value of such plants in the marketplace. After retiring, Niemiec continued working as a consultant in the industry and served on several industry committees related to the gas processing business. He testified that the property was special because of the infrastructure in place to support a gas processing plant, its location in a long-lasting and highly-productive gas field, and its established history of processing gas in that area. He characterized it as "unique" because of the lease provision requiring Enbridge to remove its plant after the lease terminated. He opined that many companies in the processing business would be interested in the property as it was on April 7, 2004 because of the cost savings inherent in the existing infrastructure and the opportunity for whoever owned it to capture the gas processing business in the area.

Niemiec had examined records produced by Enbridge and testified (without contradiction by Enbridge) that a plant on the property would process approximately 80 million cubic feet of gas per day, produce projected earnings from the liquids portion of that processing before interest, taxes, depreciation, and amortization (EBITDA) of $16,500,000 per year, and have additional income from other fees a plant operator would typically charge its customers. Industry standards for valuing processing plants ranged from 10 to 14 times EBITDA, so $16,500,000 in annual EBITDA would yield a value of $165 to $231 million for the property with a plant on it. Niemiec estimated the property, absent Enbridge's plant, would be worth $18 to $22 million to a buyer who could build a new plant on it for $50 to $52 million, secure the projected $16,500,000 EBITDA, and own an asset valued at $165 to $231 million that was producing annual EBITDA of approximately 22% to 23% on invested

it is offered for sale by one who desires to sell, but is not obliged to sell, and is bought by one who desires to buy, but is under no necessity of buying it, taking into consideration all of the uses to which it is reasonably adaptable and for which it either is or in all reasonable probability will become available within the reasonable future.

capital. His valuation was based only on the property's projected ability to produce an income stream:

Q: What do you think you and a group of investors in 2004, if you had known the site was leased and that the lease was expiring, would have been willing to pay for the 23.79 acres involved in this lawsuit?

A: Having worked with a number of investors like Warburg Pincus and JP Morgan and various things, they have pools of money looking for investments. And what I said in my report, knowing what I know about the site and the lease, that we would be willing to put up a minimum of $18 million for the site knowing that this lease is expiring and knowing, as a knowing buyer, what I know about would have to be done to move this plant per the lease.

Q: And did you say earlier that the range you thought was reasonable, from looking at it from that point of view, was 18 to 22 million?

A: Yes.

Q: Okay. Let's assume that you had to pay the highest price, 22 million for the land. And how much would it cost to build a new plant on this site that's already permitted and everything, got all the stuff going on?

A: Well, it would be less than the $50 million ... it would be less than the $52 million than [sic] I had before, so....

Q: What number, 51 million?

A: 50.

Q: One-and-a-half. So you would have 72 million in it, right?

A: Yes.

Q: If you bought it for the cheapest, 18 million, you'd have—18 plus 50 would be 68 million, and have a new plant sitting on this site; is that right?

A: Yes, 68 million.

Q: Would that tend to be a valuable proposition for any buyer?

A: Yes. It cost you—it'd cost you 68 million, and you've got a value in the plant of 165 to 231 [million]. So that would be a valued proposition that somebody would want to do....

Q: Okay. I'm told by my lawyer that I didn't make it clear that the 18 to 22 million is for the land only.

A: Yes.

Q: Not talking about you buying the old plant. And so if you bought the land only and the old plant went away, so you built you a brand new plant, you would still have between 68 and $72 million total in the property, depending on the range you paid for the land, 18 to 22, right?

A: Yes.

Q: Explain to this jury—maybe you have, but one more time, why would it make economic sense for anybody in the gas processing business to pay between 18 and $22 million to buy this site if—let me back up.

If a tornado came along on April 6th at 11 o'clock at night and wiped this plant out, what kind of money would you be willing to pay, UP Fuels, people in the industry, for this site, even if the plant is gone?

A: The—I'd still pay the 18 to $22 million.

Q: Why?

A: The way I think about it—and we can use the tornado, but that's a way to just kind of lift it up and take it out of there so that we have the land at that time vacant. But the pipeline is coming in; the pipeline is going out; the air permits; the electrical power that's there; the customers are all still there. So I would simply put a plant in there. I would have to spend the money to do

that, the $50 million, but the earnings off of these plants is enough to justify that.

Q: Did you explain all of this to David Bolton?

A: I did.

. . . .

Q: Would anybody knowledgeable in this business, in the gas processing business, anybody understand that it's a heck of a bargain to buy this tract in . . . Avinger, Texas . . . to capture this kind of value and this kind of annual income? Even if it is in Marion County?

A: They would—they would understand that, and they would see the value in that.

The above passage, among others, makes it clear that Niemiec based his opinion of value on the property without Enbridge's plant on it, and that his opinion did not take into account any value for Enbridge's plant, Enbridge's cost to remove the plant, or the property's special value to Enbridge.

## B. David Bolton

The Court says that in his appraisal report Bolton "concluded that a prudent and knowledgeable investor, considering Enbridge Pipeline's cost savings, would pay between $21,750,000 and $28,500,000 for Avinger's interest" and that "[t]he only interest that should have been appraised was Avinger's interest in the land. However, . . . this was not the interest that was valued in Bolton's report." 386 S.W. 3d at 263. But Bolton's report was not introduced into evidence at trial. The valuation testimony the jury heard from Bolton was that the market value of the property was $20,955,000 if the Enbridge plant did not exist or had been "swept away by a tornado." That value did not include any amount attributable to the plant, Enbridge's obligation to remove it, or cost savings to Enbridge if it did not have to

remove it. Bolton specifically testified that he appraised the tract and formed his opinion of its market value based on "typical market participants," and not on its special value to Enbridge as the taker, or its value to Avinger as the seller:

Q: Now, is the—in the definition [of market value], it asked about the price of a seller willing to sell and a buyer willing to buy. Is it the value to Avinger Timber or the value to Enbridge Pipeline Company that you're trying to appraise?

A: No. We're appraising the value of the property.

Q: And is it the value to that mythical seller in the definition whose name is not given and the mythical buyer?

A: It's to typical market participants.

Q: Do you know why, in the definition of appraisal, that it doesn't set forth the particular value to the owner or the particular value to a specific person?

A: Well a value to a particular person or a particular entity may have something special over and above or less than typical market participants. So that may be a value to that person, but it wouldn't be a value in exchange.

Just as Niemiec did, Bolton explained that the site was valuable because of its physical location in a highly productive gas field, the existing pipeline infrastructure that included fifteen or sixteen pipelines through which gas arrived at the site for processing, the existing electrical supply to the property, and the fact that the site was already permitted for operation of a gas processing plant. His opinion was that the property would be an attractive investment for gas processing businesses because it would allow a buyer to begin processing gas at least a year sooner than if the buyer purchased a new site, obtained permits for it, and constructed a new

plant. Further, a buyer of the property would not have to contend with the creation of a pipeline infrastructure for a new processing site or start competing for customers. His testimony of $20,955,000 value was based on two separate income analyses and a comparable sales analysis.

Niemiec and a consultant named Jeff Spearman[2] provided Bolton with cost estimates for Enbridge to remove its plant and relocate it to another site. The minimum estimated cost for Enbridge to do that was $29 million which included building a temporary plant on the property to process a reduced amount of the gas received at the property while Enbridge located, acquired, and permitted a new site, then moved its existing plant. The temporary plant scenario was discounted by Niemiec as a poor choice at best because it would reduce Enbridge's processing revenue significantly and disrupt operations of the producers supplying gas. Bolton understood from Niemiec that under the best and most viable scenario for Enbridge, if it did not buy the property or execute a new lease with Avinger at market rates, it would incur a minimum $38 million cost. That cost included Enbridge leaving the existing plant where it was and continuing to process gas at a normal rate while it built another plant close by and then selling the existing plant for salvage. Leaving its plant in place and building a new one would allow Enbridge to continue capturing the full amount of revenue from the gas processing business while it transitioned to a new plant—a time estimated to be at least 12 months and likely 18 to 24 months—and would avoid disrupting the business of its gas suppliers and incurring their ill will as well as losing some or all of the revenue for processing gas. This latter scenario apparently was the most probable from Enbridge's point of view, also.

Avinger presented the testimony of Kyle Hart, who worked in management at Enbridge's plant. Hart testified that it would have cost Enbridge an estimated $20 million to move the plant and that cost made moving it prohibitive.

The only value testimony Bolton gave relating to cost savings to Enbridge was that the value of the property to Enbridge would have been much greater than the $20,955,000 he concluded was its market value absent the plant. In giving that testimony Bolton did not refer to the higher appraisal numbers in his report, even though at one point he was specifically asked about the property's value to Enbridge as opposed to its value to a third party buyer. His opinion was that it would be greater to Enbridge because of Enbridge's cost savings:

Q: If you had been asked in this case—if this were not a condemnation case, but you were asked to do an appraisal of what the value of this property was to the tenant, would it have been more or less than your opinion of the value to a willing buyer?

A: No. It would have been more.

Q: And explain to the jury why you say that.

A: Well, their cost savings would be something like $38 million if—considering the lease and considering their position to construct a new land [sic] less the salvage. And I believe Mr. Niemiec's numbers are $38 million. I think that would represent that scenario.

Q: Focusing you on other buyers—not Enbridge, focusing you on other buyers, are the Enbridge costs to relocate the plant or the tenant costs to relocate the plant relevant to those other buyers?

A: Sure.

2. Spearman worked for a consulting company that specialized in mid-stream gas processing.

Q: Why? Can you explain that to the jury?

A: Sure. Because anyone looking to buy this is—and the lease was terminating, and they—and if the tenant had to move, then they're faced with relocating at a net cost of at least $38 million. Well, if a prospective buyer can come in because of the location ... of the pipelines and because of the amount of actual business that goes through that site, would—any dollar amount that they can buy that for substantially less is going to be a factor they consider, I think.

### C. Discussion

The Court takes issue with Bolton's consideration of Enbridge's contractual obligation (and right) to remove its plant under the lease agreement. But Bolton's uncontradicted testimony was that the US-PAP requires appraisers to "analyze the effect on value, if any, of the terms and conditions of [any] lease." In his opinion the lease provision giving Enbridge six months to move its plant was a factor affecting the value of the property that not only *could* be taken into consideration, but *had* to be taken into consideration under the USPAP and Texas law because it would affect the value to a hypothetical willing buyer. As reflected by the testimony quoted above, Bolton's opinion was that a willing buyer would factor Enbridge's relocation costs and the potential for purchasing Enbridge's plant into the property's value. Because such a buyer would consider that factor, he was bound to consider it in appraising the property's value. But he never testified to a value for that factor. His testimony was clear that his opinion of the property's market value without Enbridge's plant on it was $20,955,000, and that value was based on accepted methods of appraising properties by using sales comparisons and the property's projected ability to produce in-

come—not its value to Enbridge because of the cost savings Enbridge could obtain by purchasing the property, nor the value of the Enbridge plant. On the other hand, as a licensed appraiser he could not ignore the fact that for up to six months after the lease expired on April 2, 2004, a purchaser's use of the property was subject to the presence of the plant, Enbridge's right and obligation to remove the plant, and the effects of those on the property's market value. In his testimony Bolton detailed his investigations and the bases for his calculations and opinion. Donnie Sherwood, an appraiser hired by Enbridge, testified clearly that he had no basis to criticize Bolton's methodology or his conclusions.

The Court does not criticize Bolton's methodology or the information underlying his opinion. Nor does the Court point to any portion of Bolton's testimony showing that his opinion of the property's market value included any amount for "the gas processing facility that Enbridge Pipelines gained." Manifestly, any potential buyer of the property would assess all aspects of it before investing: it was rural East Texas timber land except for its being the site of a longstanding gas processing operation with particular attributes and advantages. Under the USPAP and Texas law, Bolton could not ignore the effect of Enbridge's lease rights and obligations on the property's market value. The property was burdened by those; they affected the ability of any potential purchaser to use the property as well as provided an opportunity for decreasing the costs necessary to purchase and make the property profitable by possibly purchasing Enbridge's plant for less than the cost of building a new one. Bolton would have been blinking reality, as well as violating his professional obligations, if he disregarded the effect of the lease terms. Certainly the potential cost

savings to a buyer could fail to come to full fruition if, after the buyer purchased the property, Enbridge dismantled and moved its plant instead of selling it to the buyer for a price lower than the cost to build a new plant. But that is the nature of business risk: potential cost and profit drive the price of any business property.

Even though Bolton considered the lease and its terms, there was no evidence he put any amount into his $20,955,000 valuation of the property because of the costs to Enbridge to remove the plant. His report might have included value in its figures based on Enbridge's obligation to move its plant and cost savings if it did not do so, but those figures were not referred to or used at trial by Bolton or Avinger. Despite the Court's characterization of his testimony otherwise, he never wavered from the position that his testimony to the jury about the property's value was based on its market value as a tract without Enbridge's plant on it, not its value with Enbridge's plant on it, the property's special value to Enbridge, or Enbridge's cost savings if it purchased the property and did not have to move its plant.

### IV. Conclusion

For the reasons expressed above and those expressed by the court of appeals, I agree with the court of appeals that Bolton's opinions did not violate the value-to-the-taker rule and that his valuation opinions were not speculative. 326 S.W.3d 390, 406–08, 411. His opinions were based on two different income analyses that he properly supported and a comparable sales methodology that he fully explained. Moreover, as explained by the court of appeals, his opinions did not violate the project-enhancement rule. *Id.* at 408–10.

I agree with the Court that the trial court did not abuse its discretion by excluding Albert Allen's testimony because he improperly valued the land as vacant rural residential property.

I would affirm the judgment of the court of appeals.

